UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEVEN W. LEONARD,            )
                             )
              Plaintiff,      )
                             )
vs.                           )        No. 4:05CV01154 SNL (AGF)
                             )
JO ANNE B. BARNHART,          )
Commissioner of Social Security, )
                             )
              Defendant.      )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Steven W. Leonard's application for

disability insurance benefits under Title II of the Social Security Act (SSA), 42 U.S.C.

§§ 401-434. The action was referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below,

the Court recommends that the decision of the Commissioner be reversed and remanded

for further development of the record.

Plaintiff, who was born on April 2, 1957, filed an application for disability

benefits on October 14, 2003, claiming that he had been unable to work since April 15,

2002,[1] due to bilateral carpal tunnel syndrome; arthritis with disc degeneration, causing

---

[1]      Plaintiff initially claimed a disability onset date of April 15, 2001, but later
amended this to April 15, 2002.

back pain and numbness in his hands and legs; attention deficit disorder (ADD); anxiety attacks; and high blood pressure. Tr. at 88, 126. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). A hearing was held on December 1, 2004, and on January 25, 2005, the ALJ issued a decision that Plaintiff was not disabled as defined by the SSA. The Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action.

Plaintiff argues that the ALJ failed to fully develop the record with regard to Plaintiff's mental impairments; improperly discounted Plaintiff's allegations of pain; and improperly relied upon the Commissioner's Medical-Vocational Guidelines (Guidelines), 20 C.F.R. Pt. 404, Subpt. P, App. 2, to determine that Plaintiff was not disabled.

## BACKGROUND

### Plaintiff's Work History and Application Forms

The record indicates that Plaintiff worked as a welder from 1975 to 1988. From 1988 until 1996, Plaintiff worked as a drywall installer/painter, owning his own company from 1991 to June 1996. From June 1996 until April 2002 he also worked as an estimator for drywall/painting jobs for the company, which he had turned over to his son in approximately 2000 and which went bankrupt in 2002. Plaintiff's earnings records show an annual income of from approximately $20,000 to approximately $45,000 from

1986 through 2000. His income declined to approximately $15,000 in 2001, and to approximately $10,000 in 2002. Tr. at 55-56.

On November 13, 2003, Plaintiff completed, with the help of his non-attorney representative, a questionnaire supplementing his application for disability benefits. Plaintiff indicated that his wife (from whom he was separated) took care of paying his bills and his checkbook, because he had trouble focusing and dealing with finances due to his ADD. He also indicated that his wife did the laundry, shopping, and housework, and that he could not do such things due to his back and hand pain, although he did try to do some car maintenance for short periods of time. He stated that he had trouble carrying heavy bags out to the trash due to pain in his back and hands. He reported that his pain interrupted his sleep. Plaintiff stated that he could take care of his personal needs, although he had some trouble dressing himself and had to do everything at a slower pace. Plaintiff reported that he watched a lot of TV, indicating that he could watch a 30-minute show, but not a one-hour show or a two-hour movie without being in pain and having to move. He indicated that he did not have difficulty leaving his home and did so four to five days a week for 15 minutes to two hours, depending on what he was doing. Plaintiff wrote that he had trouble understanding instructions and comprehending what people told him, due to his ADD. He also indicated that he did not have problems getting along with people. Tr. at 88-92, 126-27.

## Medical Record

The record includes treatment notes from September 10, 1991 through November 10, 2004, by Plaintiff's treating physician, Christopher Abercrombie, D.O.  Notes from November 12, 1998, indicate that Plaintiff was under stress and experiencing anxiety, for which he was prescribed Xanax.   These notes also indicate that Plaintiff had no insurance. Tr. at 173.  On June 2, 1999, Plaintiff reported that the Xanax helped, but not enough, and that he wanted to try something different.  Xanax was discontinued and Plaintiff was prescribed Valium; however, on June 19, 1999, Plaintiff reported that the Xanax had worked better and he again started to take that.  Tr. at 175.  On September 9, 1999, Plaintiff still had no insurance; his prescription for Xanax was renewed, and he was given a three-month supply of Zyban/Wellbutrin (antidepressants).  Tr. at 175.  Treatment notes from May 3, 2001, state that Plaintiff now had insurance, but could not afford the co-pay for Buspar (used to treat anxiety).[2]  Tr. at 180.  Plaintiff reported that his "nerves" were okay, that he had good and bad days, and that he still felt the need for four Xanax a day.  On November 2, 2001, Plaintiff's prescription for Xanax was renewed.  Tr. at 181.

There is no evidence of further treatment until May 20, 2002, with notes from that date stating that Plaintiff's anxiety had recently increased; he reported a bad fight with his girlfriend resulting in the police escorting him out of the house.  Plaintiff reported that his business was going bankrupt, that he could not sleep, that he had no insurance, and that

---

[2]      The Court notes that this statement is followed by a question mark.

he could not afford Wellbutrin. Dr. Abercrombie diagnosed anxiety/depression and insomnia. He noted that Plaintiff might be suicidal, although Plaintiff denied having a suicide plan. Dr. Abercrombie recommended immediate psychiatric evaluation, with Plaintiff possibly needing inpatient treatment. Dr. Abercrombie reported that Plaintiff refused this recommendation, as he did not want to be admitted to a psychiatric unit. Plaintiff's prescription for Xanax was refilled. Tr. at 182. On November 15, 2002, Plaintiff complained of depression and having no drive or energy, but his anxiety was noted as under control. Plaintiff was given samples of Wellbutrin. Tr. at 183.

On June 4, 2003, Dr. Abercrombie diagnosed adult ADD in addition to depression and anxiety. Decreased appetite and sleeplessness were noted. Dr. Abercrombie again recommended counseling and a psychiatric evaluation, as well as a sleep study for narcolepsy. Tr. at 184.

On June 23, 2003, Plaintiff reported back and neck pain and swelling of his hands. Dr. Abercrombie diagnosed tenosynovitis (inflamation of tendons) of the hands and cervical/thoracic strain, and prescribed Naproxen and Flexiril (anti-inflammatory drugs). The notes from this date indicate that Plaintiff had insurance at that point. Tr. at 185.

On August 25, 2003 (almost a year and a half after his alleged onset of disability in April 2002), Plaintiff visited a chiropractic office with complaints of pain between his shoulders, in his neck, arms, and hands, and numbness in his hands. He reported that he experienced this pain when he painted, which he was doing part time, stating that when he did overhead work he would suffer for three days afterwards. He also reported that his

current leisure activities included playing the guitar and doing computer work. Plaintiff indicated on the intake form that he had insurance. He was examined by C. E. Klinginsmith, D.C., who assessed Plaintiff's condition as fair, and diagnosed cervical thoracic syndrome with arm weakness and paresthesia (abnormal sensation of tingling and numbness). Six-to-eight visits for treatment were planned, and Plaintiff was counseled not to do any overhead work and to see a physician for more testing for paresthesia. Office notes show that Plaintiff returned for treatment the next day and the day after that. Tr. 153-63.

Plaintiff saw Dr. Abercrombie again on September 22, 2003. He reported that he was applying for disability benefits due to chronic neck and back pain and ADD, and Dr. Abercrombie ordered diagnostic tests. Tr. at 186. MRIs of Plaintiff's cervical spine and lumbar spine conducted on October 2, 2003, showed a mild disc bulge at C5-6, mild disc bulge at L4-5, and facet joint degenerative disease at L5-S1. Tr. at 145-47. The results of motor and sensory nerve conduction tests performed on October 3, 2003, were considered consistent with mild bilateral carpal tunnel syndrome, worse on the right. Tr. at 148-51. On October 27, 2003, Dr. Klinginsmith took cervical and throacic x-rays and reported findings of throacic scolosis and arthritic changes at the C5 level with anterior spurring. Disc spacing was found to be intact, and there was no indication of fractures or other pathology. Chiropractic treatment was recommended. Tr. at 166.

Plaintiff saw Dr. Abercrombie again on December 22, 2003, after having been hospitalized for influenza and respiratory distress from December 13-15, 2003.  Tr. at 187.

A Psychiatric Review Technique form was completed by non-examining consultant James Spence, Ph.D., on December 29, 2003.  Dr. Spence was asked to assess Plaintiff's organic mental disorder (ADD), affective disorder, and/or an anxiety-related disorder.  These disorders are listed in Appendix 1 of 20 C.F.R. part 404, Subpart P, as listings 12.02, 12.04, and 12.06, respectively, and are presumptively disabling if certain criteria are met.[3]  Dr. Spence opined in check-box format that these disorders imposed only mild limitations upon Plaintiff's activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace; and that Plaintiff had experienced no episodes of extended-duration decompensation.  Thus the "B" criteria for the listings were not met.  Tr. at 98.  Dr. Spence opined that the records he reviewed did not establish the presence of "C" criteria with regard to Plaintiff's affective or anxiety-related disorders.  Tr. at 99-110.

In narrative form, Dr. Spence noted that Plaintiff failed to follow the recommendation of his primary care physician for a psychiatric evaluation and treatment,

---

[3]    The Commissioner's listings for these disorders  set forth three criteria, "A," "B," and "C."   ADD is deemed disabling when both A and B are met, or when C (complete inability to function independently outside the area of one's home) is met; the other two disorders are deemed disabling when both A and B are met, or when both A and C are met.

and that most of the limitations cited by Plaintiff on his claimant's questionnaire related to his physical condition, especially pain. Dr. Spence also noted that Plaintiff indicated that he could not watch a 30-to-60 minute TV show or a two-hour movie, yet Plaintiff stated that he spent most of his time during the day watching TV. Dr. Spence concluded that Plaintiff's "psych" impairments did not result in significant limitations in his functioning. Tr. at 111.

On September 9, 2004, Plaintiff wrote a letter to his representative in this case, asking him to try to move the case forward because he was in severe financial distress. He noted that his sister had been making his house payments and paying for his groceries and medications. Tr. at 79.

A prescription summary of Plaintiff's medications from January 1, 2004 through September 7, 2004, shows repeated prescriptions for Methylphenidate (Ritalin, used to treat ADD), Alprazolam (Xanax), Atenelol/Chlorthal (used to treat high blood pressure), and two prescriptions for Oxycodone (used to relieve moderate to moderate-to-severe pain) in March 2004. Tr. at 83-84.

On March 10, 2004, following an examination, Dr. Abercrombie completed a physical capacities evaluation of Plaintiff in connection with Plaintiff's application for disability benefits. Dr. Abercrombie indicated in check-box format that Plaintiff could sit for a total of one hour in an eight-hour workday and stand/walk for a total of one hour in an eight-hour workday; needed an opportunity to alternate sitting and standing at will throughout the day; could not use his left hand for simple grasping, pushing, pulling, or

fine manipulation; could not use either foot for repetitive movement, as in operating foot controls; could lift up to 20 pounds occasionally; could never lift anything heavier; could occasionally climb and balance; could never stoop, kneel, crouch, crawl, or reach above shoulder level; and could never work at unprotected heights or around moving machinery. Tr. at 193-94.

Dr. Abercrombie wrote that Plaintiff had chronic back, neck, and hand pain; degenerative disc disease; spinal stenosis; peripheral necropathy; ADD; depression; and anxiety. Dr. Abercrombie opined that Plaintiff's pain, which Dr. Abercrombie assessed as moderate, was disabling to the extent of preventing full-time sedentary work, and that Plaintiff had deficiencies of attention and concentration due to pain and/or side effects from medication that would result in a failure to complete tasks in a timely fashion. Tr. at 192. On a separate questionnaire form, Dr. Abercrombie opined that Plaintiff would not be able to perform light or sedentary work, and that the nature and severity of Plaintiff's symptoms would affect his ability to perform work requiring prolonged concentration or close attention to detail. Tr. at 195.

On December 6, 2004 (several days after the evidentiary hearing), non-examining medical consultant Jerry Kinder, M.D., completed a physical RFC assessment, indicating a primary diagnosis for Plaintiff of mild degenerative disc disease and a secondary diagnosis of mild carpal tunnel syndrome. Dr. Kinder indicated that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit for six hours in an eight-hour workday, and had no limitations in

pushing and/or pulling, including operation of hand controls. Dr. Kinder found that Plaintiff had no postural (e.g., climbing and stooping), communicative (hearing and speaking), or environmental limitations. In narrative form, Dr. Kinder characterized Plaintiff's representations on his application forms as stating that he still took out the trash, did car repairs, and drove. Dr. Kinder also saw an inconsistency, as had Dr. Spence, between Plaintiff's statement that he spent most of the day watching TV and his statement that he could not sit more than 15 minutes at a time. Dr. Kinder opined that Plaintiff's complaints were for the most part not attributable to medically determinable impairments and seemed to be exaggerated and disproportionate to the medical evidence in the record. He further opined that a preponderance of the evidence indicated that Plaintiff's allegations were not credible. Tr. at 93-98.

**Evidentiary Hearing**

Plaintiff testified at the December 1, 2004 hearing that he was 47 years old, and had quit school and gone to work after 10th grade because he could not understand the school work and did not feel that he was learning anything. He worked for 15 years in the drywall business, until April 15, 2002, owning his own business for part of the time. Towards the end of his working years, Plaintiff did less manual labor and worked in "bidding out" the jobs, although he still had to get buckets of paint to the job sites. At some point shortly before 2002, Plaintiff had turned his business over to his son; in 2002 the business went bankrupt. Plaintiff testified that he stopped working because he "hurt so bad" and could no longer do the lifting involved. He testified that one day of lifting

10

the buckets of paint "would put me down for four days." He testified that he currently had no source of income and had not had medical insurance for over a year. Plaintiff testified that the only doctor he could afford to see was Dr. Abercrombie, whom he was seeing once every six months. Tr. 199-201.

Plaintiff described his pain as starting at the top part of his neck and radiating down to his shoulder blades and arms. He stated that his hands would go numb so that he could no longer grip things. Plaintiff testified that he also had back pain but had never been offered a surgical option, which he assumed was due to his being unable to afford it and having no medical insurance. He testified that he had been taking Hydrocodone for his pain, but that his doctor stopped these medications and recommended that Plaintiff see another doctor for pain management, which Plaintiff had not done due to his lack of insurance and income. He stated that he could barely afford his monthly prescriptions, which cost about $70 per month. Tr. at 201-03.

Plaintiff testified that his pain would wake him from his sleep during the night. He testified that trying to mow his lawn would "put me out for a while," that it took him two days to mow his "little" lawn on a riding mower, and that this activity resulted in "excruciating" pain for which he would go to the hospital for a "shot" if he could afford it. He testified that his pain ranged in intensity from a seven on a good day to a nine and a half on a bad day, on a scale of one to ten, with ten being the highest level. He testified that he had about three good days a week, and that to try to relieve his pain, he would lie on a vibrator and take aspirin or Tylenol, but that nothing helped much. Plaintiff stated

that he would change positions, from sitting to standing to walking, every 10-to-15 minutes, to try to relieve the pain. He stated that he did very little driving, because he had trouble maintaining one position for more than 15 minutes and because he would get drowsy at the wheel. Tr. at 203-05.

Plaintiff testified that he did not leave his house very often, and that his sister and estranged wife helped him and drove him places. He did not go to church anymore because he had trouble sitting for long periods of time, and he did not go to restaurants because he had anxiety attacks, feeling everyone was watching him. Plaintiff stated that in the past year he completed a five-or-six week course for anger management, but did not go to a psychiatrist for therapy, as had been recommended to him, because he could not afford it. He stated that when his business was failing after he gave it to his son, his sister had made his house payments for him for over a year, so that he would not lose his house "through all this." He thought that he might have had a nervous breakdown when he gave the business to his son. He would try to go to work and would end up sitting in a closet crying, at which point his sister took him to Dr. Abercrombie, who prescribed antidepressants. Plaintiff testified that he had worked his whole life and was not used to not being able to pay his bills and do things. Tr. at 206-08.

Plaintiff testified that when he went to see Dr. Abercrombie for depression, Dr. Abercrombie diagnosed ADD and prescribed Adderall, which seemed to help. Plaintiff testified that the Adderall was later switched to Ritilin, because the Adderall was too expensive. Plaintiff testified that he did not read very well and could not retain what he

12

read. He testified that he did not know how to pay his bills, and that his wife (and ex-wives) had always taken care of paying his bills as well as the paperwork of his business. He testified that when he first started the business he had a partner, who then embezzled $80,000 and wiped him out, resulting in Plaintiff and his wife starting a new company. Tr. at 208-209.

Plaintiff testified that he had carpal tunnel syndrome which affected both hands. He thought this developed from typing proposals at the business after he no longer wanted to deal with customers because his anxiety attacks had gotten worse. Plaintiff testified that he could no longer play the guitar or work on cars, things he used to love doing. He stated that he had a 1969 AMX, which he had restored, and that he had not "turned a wrench to it" in over a year. Plaintiff stated that he spent most of the day sitting around his house trying to get comfortable. He testified that he did a little dusting around the house, but that his wife did most of the cleaning. For meals he would have a hotdog that he cooked in the microwave or eat what his wife or sister prepared for him. Tr. at 209-11. The ALJ did not question Plaintiff at the hearing.

**ALJ's Decision**

The ALJ stated that Plaintiff had severe impairments, but none that individually or in combination met or medically equaled any of the presumptively-disabling impairments listed in the Commissioner's regulations. The ALJ turned to consider whether Plaintiff had the residual functional capacity (RFC) to perform his past work, and if not, to perform other work. The ALJ noted the relevant factors in assessing the credibility of Plaintiff's

subjective complaints, as set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984), and stated that if all of Plaintiff's allegations were fully credible, Plaintiff would be unable to work.  Tr. at 13.

After summarizing the medical record, the ALJ concluded that Dr. Abercrombie's March 10, 2004 assessment of Plaintiff's condition was "inconsistent with the evidence as a whole, including the minimal findings from testing and examination and the claimant's activities."  Tr. at 14.  The ALJ pointed to the lack of evidence of medical treatment from November 2, 2001 until May 20, 2002, and noted that an absence of treatment is inconsistent with complaints of disabling impairments.  The ALJ stated that Plaintiff continued to drive, take out the trash, and do car repairs.  The ALJ believed that Plaintiff's statement on his application forms that he was not able to watch an hour-long TV show without experiencing pain was inconsistent with his statement that he spent most of the day watching TV.  In sum, the ALJ determined that Dr. Abercrombie's evaluation was of "little weight."  Tr. at 15.  The ALJ also concluded that Plaintiff did not have a severe blood pressure condition.  Tr. at 15.

With regard to Plaintiff's mental limitations (ADD, anxiety, and depression), the ALJ noted that Plaintiff had received psychotropic drugs for these conditions from Dr. Abercrombie, and had refused Dr. Abercrombie's recommendation for psychological evaluation and treatment.  Tr. at 15.  The ALJ stated that although Plaintiff claimed that due to his ADD he had trouble understanding instructions and comprehending what people told him, Plaintiff ran his own business for several years.  The ALJ also pointed to

14

Plaintiff's statement on his claimant's questionnaire that he did not have problems getting along with people. The ALJ added that most of the limitations cited by Plaintiff on the questionnaire related to his physical complaints, especially pain. Tr. at 15.

Again noting that an absence of treatment is inconsistent with complaints of disabling impairments, the ALJ observed that Plaintiff had received no psychiatric or psychological therapy and had never been hospitalized for depression or a nervous condition. The ALJ found that Plaintiff's mental issues only mildly impaired Plaintiff's social functioning and daily activities, and that there was no persuasive evidence that they impaired his concentration, persistence, or pace to more than a mild degree, or that they caused him to deteriorate or decompensate in work or work-like settings. The ALJ concluded that Plaintiff did not have a severe mental impairment. The ALJ found Plaintiff's allegations of an inability to afford treatment unconvincing, noting that Plaintiff had a restored 1969 AMX, which he could have sold and used the money for medical treatment. The ALJ also stated that Plaintiff did not show that he had been denied treatment because of an inability to pay, or that he had made efforts to obtain treatment on an ability-to-pay basis. Tr. at 15. In sum, the ALJ concluded that Plaintiff had the RFC to perform the full range of light work,[4] and that as such, he could not return to his former

---

[4] "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to 10 pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.

(continued...)

work which involved heavy lifting. The ALJ applied the Guidelines, and based upon Plaintiff's age, education, and work experience, concluded that Rules 202.17 and 202.18 directed a finding of not disabled.[5]

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoted case omitted). This "entails 'a more scrutinizing analysis'" than the regular substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted,

---

[4](...continued)
Social Security Ruling 83-10 elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. SSR 83-10, 1983 WL 31251, at *6 (1983).

[5] The Guidelines are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.

however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

In order to qualify for Social Security disability benefits, a Plaintiff must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner employs a five step evaluation process.  First, the Commissioner decides whether the claimant is engaged in substantial gainful activity.  If so, disability benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits an individual's physical or mental ability to do basic work activities.  In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

If the claimant's impairment is not severe, disability benefits are denied.  If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1 (20 C.F.R.,

17

Pt. 404, Subpt. P).  If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work.

If the claimant is able to perform his past relevant work, he is not disabled.  If the claimant cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his age, education, and work experience (vocational factors).  If not, the claimant is declared disabled and is entitled to disability benefits.  20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003).

The claimant bears the initial burden at step four to show that he is unable to perform his past relevant work.  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  If met, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors.  Id.  If a claimant's impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Commissioner's Guidelines.  Id.  Where a claimant cannot perform the full range of work in a particular exertional category of work (very heavy, heavy, medium, light, and sedentary) listed in the Guidelines, due to nonexertional impairments such as pain, depression, or manipulative limitations, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but

must consider testimony by a vocational expert.  Id.;  Sanders v. Sullivan, 983 F.2d 822,

823 (8th Cir. 1992).  Here, the ALJ decided at step five that, based upon the Guidelines,

there were jobs in the economy that Plaintiff could perform.

## ALJ's Development of the Record with Regard to Plaintiff's Mental Impairments

Plaintiff argues that the ALJ failed in his duty to fully develop the record with

regard to Plaintiff's ADD, anxiety, and depression.  Plaintiff argues that the record before

the ALJ did not contain sufficient medical evidence to allow the ALJ to make an informed

decision about Plaintiff's mental impairments, and that therefore the ALJ's determination

that these impairments were not severe is not supported by substantial evidence.  Plaintiff

argues that the ALJ unduly focused on Plaintiff's refusal to go for psychiatric evaluation

and treatment, as recommended by Dr. Abercrombie in May and June 2003.  Plaintiff

points to his history of ongoing treatment with Dr. Abercrombie for his

depression/anxiety/ADD, as reflected in Dr. Abercrombie's notes.  In sum, Plaintiff argues

that the case should be remanded, so that the ALJ can obtain a consultative mental

examination of Plaintiff and then make an informed decision on this matter.

Although a claimant for disability benefits has the burden of proving a disability

and of furnishing evidence that can be used to reach a conclusion that he is disabled, 20

C.F.R. § 404.1512(a), the ALJ also has an independent duty to develop the record fully

and fairly, even if the claimant is represented by counsel.  Boyd v. Sullivan, 960 F.2d 733,

736 (8th Cir. 1992) (citation omitted).  "[A]n ALJ is permitted to issue a decision without

obtaining additional medical evidence so long as other evidence in the record provides a

sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (citation omitted).

Here, the only medical evidence in the record on how Plaintiff's ADD, depression, and anxiety affected his ability to work is Dr. Spence's December 29, 2003 assessment. As noted above, Dr. Spence was a non-examining consultant. Generally, a non-examining consultant's opinion does not constitute substantial evidence. Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). This is true especially where, as here, the consultant gives no specific medical findings to support his assessment. Lauer, 245 F.3d at 705. Furthermore, the reasons Dr. Spence did offer in support of his conclusions, reasons later repeated by the ALJ, are not persuasive. The Court sees no inconsistency between Plaintiff's assertions that he watched TV most of the day and his assertion that he could not watch TV in one position for more than 30 minutes. And the fact that Plaintiff may have focused in his application forms more on his physical pain is not a solid ground for discrediting the mental impairments he also alleged.

Both notable and puzzling is that fact that Dr. Abercrombie apparently was only asked to complete a physical RFC assessment and not a mental one. Upon review of the record, the Court believes that the record is underdeveloped with regard to the effect that Plaintiff's mental impairments had upon his RFC, and that the case must be remanded for further development in this regard. See Van Winkle v. Barnhart, 55 Fed. Appx. 784, 787 (8th Cir. 2003) (although there were periodic reports of improvement by plaintiff's mental health providers, record showed repeated instances of symptomology related to depression

and anxiety, despite treatment; ALJ should have requested a psychiatric review technique form to clarify how plaintiff's mental problems impacted her ability to work; case remanded for further development of the record); <u>Nevland</u>, 204 F.3d at 858 (ALJ did not fulfill duty to fully and fairly develop the record, where plaintiff presented medical evidence that he suffered from physical and mental impairments which prevented him from performing his past relevant work, but it was not clear how these impairments affected claimant's RFC to do other work and, instead of seeking such an opinion from plaintiff's treating physicians or, in the alternative, ordering consultative examinations, ALJ relied on opinions of non-treating, non-examining physicians; case remanded for further development of the record).

**ALJ's RFC Determination and Reliance upon the Guidelines**

It follows from the Court's above conclusions that the ALJ's reliance upon the Guidelines to meet the Commissioner's burden of demonstrating that there were a significant number of jobs in the national economy that Plaintiff could perform may have been improper. If, for example, further development of the record with regard to Plaintiff's mental impairments indicates that Plaintiff should be limited to low-stress jobs, jobs not requiring focused attention to detail, or jobs not requiring a high level of mental skills, this would erode the occupational base of light work that Plaintiff could perform, necessitating the testimony of a vocational expert. <u>See</u> <u>Sanders</u>, 983 F.2d at 823-24.

Although Plaintiff's arguments focus in large part on the ALJ's analysis of Plaintiff's mental impairments, Plaintiff also challenges the ALJ's failure to factor

Plaintiff's hand pain and carpal tunnel syndrome into the RFC assessment. Plaintiff argues that the manipulative restrictions these conditions imposed limited his ability to perform the full range of light work, and that the ALJ improperly discounted Dr. Abercrombie's opinion on this matter. Plaintiff argues that the ALJ's statements that Plaintiff continued to drive, take out the trash, and do car repairs, bases used by the ALJ in discrediting Dr. Abercrombie's opinion, constituted a mischaracterization of Plaintiff's representations on his application forms and testimony. Indeed, as Plaintiff argues, Plaintiff indicated on the forms and in his testimony that due to pain, he had trouble taking out heavy trash bags, drove very little, and had essentially been unable to do car repairs for the past year.

The state of the record with respect to Plaintiff's general RFC as assessed by the ALJ is similar to that with respect to Plaintiff's mental limitations. Only the opinion of one non-examining consultant -- Dr. Kinder -- supports the ALJ's decision that Plaintiff could perform the full range of light work. The Court believes that upon remand, the ALJ should also reconsider the extent to which, if any, Plaintiff's ability to perform the full range of light work is compromised by Plaintiff's carpal tunnel syndrome or other nonexertional limitations.

## CONCLUSION

The Commissioner did not meet her burden of showing that there were jobs in the economy which Plaintiff could perform. The case should be remanded to the Commissioner for further development of the record with regard to Plaintiff's mental

impairments, and perhaps an examination with regard to his physical impairments. The ALJ can then determine whether there are jobs in the national economy that Plaintiff could perform. In making such a determination, the ALJ may need to obtain the testimony of a vocational expert.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings.

The parties are advised they have eleven (11) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 14th day of August, 2006.